[No. 27821. Department Two. April 19, 1940.]

THE STATE OF WASHINGTON, *Respondent,* v.
RUSSELL SMITH, *Appellant.*[1]

[1] Reported in 101 P. (2d) 298.

*Chavelle & Chavelle,* for appellant.

*B. Gray Warner* and *Leo W. Stewart,* for respondent.

JEFFERS, J.—Defendant, Russell Smith, was, by an information filed July 27, 1939, by the prosecuting attorney for King county, charged with the crime of rape in that

". . . he, said Russell Smith, in the county of King, state of Washington, on the 23rd day of July, A. D. 1939, wilfully, unlawfully and feloniously did then and there perpetrate an act of sexual intercourse with [complaining witness] then and there a female person over the age of ten years, not the wife of said Russell Smith, against her will and without her consent, the resistance of said [complaining witness] thereto being forcibly overcome."

To this information, defendant entered a plea of not guilty. Defendant was tried and convicted, and October 10, 1939, after a motion for new trial had been made and denied, judgment and sentence was entered on the verdict. Defendant has appealed.

The state's evidence shows that the complaining witness was seventeen years old on May 5, 1939, and that the alleged crime was committed about one o'clock on

the morning of July 23, 1939; that appellant had lived in the Ballard district the greater part of his life, and at one time had lived in the house where the alleged crime was committed. The complaining witness testified that she lived just across the street from the Edson home; that she had been taking care of children for about two years, and had occasionally taken care of the Edson children; that, on the night of July 22, 1939, about nine o'clock, she went over to the Edson home for the purpose of caring for Mrs. Edson's three children; that the ages of these children were from six years to about two years; that the children were in bed, and Mrs. Edson was just ready to leave.

She further testified that, about one o'clock in the morning, she was sitting reading, when the lights went out all over the house; that she got up and went to a window to see if the lights in the I. O. O. F. hall, where there was a dance in progress, were still on, and saw that they were; that about that time there was a rap on the front door, and, thinking it was someone to see the Edsons, she said the Edsons were not at home; that a man's voice then asked her to come out and be sociable; that she made no answer, and the man then left the porch and tried to get in through a bedroom window; that, as the man left the porch, she could see him plainly, as it was very light that night; that there was no telephone in the house, and she was afraid to run out and leave the children; that she asked this man if Bernice sent him, and he said "Yes;" that she then went and got a butcher knife from the kitchen; that she heard the bathroom window go up, and was standing in the kitchen when the man grabbed her by the neck; that she tried to hit him with the knife, but he knocked it out of her hand; that she screamed and said, "Let me go," and "Don't do that;" that they struggled

from the kitchen to the living room, where he threw her to the floor and accomplished his purpose; that he went out the back way, and that she could see him again at that time.

It further appears from the testimony of this witness that she immediately went over to the home of a Mrs. Bailey, who lived in the back of the I. O. O. F. hall, and made complaint to Arlene Taylor, daughter of Mr. and Mrs. Bailey. At this time, the witness was crying and hysterical, wringing her hands, and could hardly talk. It appears that the police were notified, and within about ten minutes, Officers John L. Sweeney and J. H. Brower arrived at the Edson home; that these officers looked over the premises and questioned the people who were there, including the complaining witness and Mrs. Bailey; that they looked at the bathroom window, which showed evidence of having been forced; that they attempted to get a description of the assailant of the complaining witness, and she gave them the name of Eddie Smith.

Officer Sweeney testified that she said she did not know where Eddie Smith lived, but thought her friend Bernice Stuart might; that the officers then took the complaining witness and Mrs. Bailey to the Stuart home and talked to Miss Stuart, going from there to the police station; that the officers then went to the Smith home and found one of the boys in a car out in front of the house; that they took him to the station, and complaining witness said that was not the person; that Sergeant White and Mrs. Bailey were in the room; that the officers then went back to the Smith home, aroused Eddie Smith and brought him to the station, and complaining witness said, "No, that is not him, but it is his brother;" that the officers then brought appellant, Russell Smith, to the station. Officer Sweeney testified: "When we walked into the station, she took

one look at him, this girl did, and said, 'That is the man,' and that is all there was to it."

There is testimony that the complaining witness was immediately examined by Dr. Rankin, who testified that from his examination he was of the opinion that there had been a rupture of the hymen within two or three hours. This examination was made at three-ten a. m., July 23rd.

Appellant's testimony was to the effect that he did not know the complaining witness, did not see her or have anything to do with her the night in question; that he was down town all evening, in various pool halls and beer parlors, in company with some friends; that they were drinking and having a good time, and that, sometime after one o'clock, he left for his home in Ballard, with Carl Abramson, in the latter's car; that he got out at Twentieth and Market, and went immediately home and to bed. Appellant was corroborated by several witnesses as to his activities during the evening, and as to the time he got back to Ballard.

Appellant first contends that the court erred in admitting certain details and particulars of the complaint into evidence, on the theory it was part of the *res gestae*. It will be noted that this objection goes principally to the statement of the complaining witness that the man's name who assaulted her was "Ed."

As to Officer Sweeney, appellant bases his claim of error on the admission of the following testimony:

"Q. (By Mr. Stewart) The nails in the casing had been forced? A. Yes. From that point, because of the nature of the case, we did not care to go into all the details with the girl, that is, by questioning her, but we talked to her enough to determine what we felt had taken place, and I believe we asked her— "

(Mr. Chavelle at this point interposed an objection to any of the details of the complaint.)

"MR. STEWART: He is entitled to say whether she had been assaulted. . . . THE COURT: Objection overruled. THE WITNESS: She admitted that she had been assaulted. Q. (By Mr. Stewart) Was your attention called to the floor in the kitchen, or any part of the house, Officer Sweeney, to the best of your recollection, or not? A. Only to the point that she pointed out that is where it took place, on the floor. I believe it would be called the living room."

(Mr. Chavelle again objected that details of the complaint were not admissible, and the court overruled the objection.)

The following testimony of Officer Sweeney was admitted without objection:

"Q. Where did you go from there? A. Well, we tried to determine if the girl had seen her assailant, if she could give any description at all. Q. What was said? A. She gave us what she could, and she gave the name. Q. What name did she give? A. Eddie Smith; and we asked her if she knew where Eddie Smith lived, and she said no, but she said that a girl friend of hers by the name of Barbara Stuart would possibly know where Eddie Smith lived. So we then took the girl with Mrs. Bailey to the station, told the sergeant, the commanding officer, the facts we had, and what we had to go on, so this girl told us where this Barbara Stuart lived. We figured well, we would go up there and ask her if she knew this Eddie Smith. MR. CHAVELLE: Was that Bernice Stuart? THE WITNESS: Bernice Stuart, possibly."

It further appears that, in the cross-examination of Officer Sweeney by. Mr. Chavelle, the latter went into the matter and inquired who the complaining witness said her assailant was, and about the name "Eddie Smith."

We also have the testimony of Arlene Taylor, daughter of Mrs. Bailey, that she heard noises in the direction of the Edson home, and heard someone say, "Let

me up, let me up. Please don't do that, Ed, my mother will kill me."

It is contended that the following parts of the testimony of Officer Brower were erroneously admitted, and prejudicial:

"Q. (By Mr. Stewart) What was said, if anything, about the name of the man that got in there? MR. CHAVELLE: I object to that. I think that is hearsay, what the name of the man was, and, furthermore, it is the law in this state that any details or particulars of a complaint—and even the cases have gone so far as to say the man's name—cannot be introduced in evidence by what the complaining witness told some officer. THE COURT: That is true, unless it is part of the *res gestae*. I understand this was immediately after the occurrence. MR. CHAVELLE: How long was it? THE WITNESS: It couldn't have been more than ten minutes after we got the call. THE COURT: Objection overruled. MR. CHAVELLE: Note an exception. Q. (By Mr. Stewart) What did she say the name was? A. She said the name was Ed."

Objection is also made to certain testimony of Mrs. Bailey, for the reason above stated:

"Q. (By Mr. Stewart) What was said with reference to who the man was that had been in the house? A. Well, she told me that she wouldn't— MR. CHAVELLE: I object to that, about naming the party. THE COURT: It is admissible on the theory of *res gestae*. Q. (By Mr. Stewart) Who was it you heard, what was the name? A. Why, immediately as soon as I talked to her. THE COURT: I think probably that should be developed a little more. . . . Q. (By Mr. Stewart) Up until that time did she give the first name or the last name? A. She was giving the first name up until then. Q. What was the first name? A. She said 'Ed'."

The testimony of Miss Taylor and Mrs. Bailey was to the effect that, when the complaining witness appeared at the Bailey home, and when Mrs. Bailey talked to her, she was crying and hysterical, and could hardly

talk; that she had marks on her neck that looked like she had been scratched and choked.

We think the rule in this and the majority of states is well established that, in cases of this kind, the prosecuting witness may testify that she made complaint after the assault, and where, to whom and under what circumstances, but she may not detail the story that she told in making such complaint; and the person to whom she made complaint may also testify that she complained, and may state the time, place, and circumstances under which the complaint was made, but not what she said concerning the circumstances and details of the assault. *State v. Hunter,* 18 Wash. 670, 52 Pac. 247; *State v. Griffin,* 43 Wash. 591, 86 Pac. 951.

The trial court admitted the testimony of Officer Brower and Mrs. Bailey, on the theory that the statements testified to were part of the *res gestae.* Appellant cites the cases of *State v. Aldrick,* 97 Wash. 593, 166 Pac. 1130, and *State v. Arnold,* 144 Wash. 367, 258 Pac. 20, to sustain his contention that details of a complaint are not admissible, even though a part of the *res gestae.*

It is true that, in both the cited cases, we held that details of the complaint were not admissible as part of the *res gestae,* but we do not think it was the intention of the court in either case to go as far as contended for by appellant. It is our conclusion that the court, on the facts as presented in those cases, held that the details of the complaint were not admissible as part of the *res gestae.* In the *Aldrick* case, the complaining witness did not make complaint to her father until the next morning after the alleged assault, and in the *Arnold* case, the complaint was not made until more than a year after the alleged assault. Clearly, in neither

case could the complaint be considered as a part of the *res gestae.*

The text writers almost universally, and the great majority of the states, which otherwise restrict the testimony to the bare complaint, recognize the exception that the whole of a statement which is strictly a part of the *res gestae* is admissible, under the general rules of evidence. 52 C. J. 1065, § 91; 22 R. C. L. 1215, § 49; *Wright v. Commonwealth,* 267 Ky. 441, 102 S. W. (2d) 376; *State v. Matson,* 120 Ore. 666, 253 Pac. 527; *People v. Baker,* 251 Mich. 322, 232 N. W. 381; *Dodson v. State,* 119 Neb. 340, 228 N. W. 859; *State v. Novak,* 151 Iowa 536, 132 N. W. 26.

We think it sufficiently appears from the testimony that the statements made to Mrs. Bailey were made so soon after the claimed assault, and under such circumstances, that they were clearly spontaneous and unpremeditated, and they were therefore admissible.

 Assuming that the statements made to Officers Sweeney and Brower could not be considered as part of the *res gestae,* and that therefore it was error to allow these witnesses to testify that the complaining witness told them the name of the man who assaulted her was "Ed," still we think it was harmless error, and could in no way have been prejudicial to this appellant, but, on the other hand, was favorable to him, as tending to show that it was not Russell Smith who committed the act. We are of the opinion that no prejudicial error was committed in admitting the testimony of these three witnesses.

 It is next contended that the trial court erred in allowing Beverly Edson to testify. While the court allowed this little girl to testify, he later ordered her testimony stricken and instructed the jury to disregard it. Appellant contends that, if the trial court had more carefully examined this witness on *voir dire,* it would

have discovered that the child was not qualified. However, it may be noted that counsel for appellant made no request to further interrogate this child before she was permitted to testify. It appears that this little girl was five years old, and while great caution should be exercised by the trial court in permitting one of that age to testify, intelligence, and not age, is the proper test to be used in determining the competency of witnesses of tender years, and the trial court has a wide discretion in such determination. *State v. Smith,* 95 Wash. 271, 163 Pac. 759. It is a common practice to withdraw from the consideration of the jury evidence subsequently discovered to have been improperly admitted, and it is generally held to cure any error caused by the improper admission, unless the testimony is so prejudicial that it is impossible to cure the error. *State v. Gay,* 82 Wash. 423, 144 Pac. 711.

In the instant case, conceding that Beverly Edson was incompetent, we do not think the testimony given by her was so prejudicial as not to have been cured by the withdrawal. This little girl testified that on the night of the alleged crime she heard a noise; that she heard drumming on the floor; that she heard the complaining witness screaming; that he squeezed her neck. There was the testimony of Miss Taylor, Mrs. Bailey and Dr. Rankin that there were marks on the throat of the complaining witness; Miss Taylor testified she heard screaming; and there was other testimony showing marks on the floor indicating a struggle.

■■ It is next contended that the court erred in refusing to give appellant's requested instruction No. 19, which is as follows:

"You are instructed that the crime of rape calls for the formation of a specific intent, and if you find from the evidence that at the time of the commission of the act, the defendant did not entertain, or was unable to

entertain such specific intent, then it will be your duty to find the defendant not guilty."

The court gave instruction No. 10, as follows:

"While a general criminal intent is involved in the crime of rape, no intent is requisite other than that evidenced by the doing of the acts constituting the offense."

Exception was taken to this instruction.

The court also, apparently out of an abundance of caution, gave an instruction on intoxication (instruction No. $10\frac{1}{2}$), to which appellant excepted. We think whatever criminal intent is necessary to be shown in the crime of rape is shown by the doing of the acts constituting the offense.

It is contended that the refusal to give requested instruction No. 19 and the giving of instruction No. 10 destroyed the effect of the instruction on intoxication. While we seriously doubt, under the facts in this case, that the trial court was warranted in giving the instruction on intoxication, it appearing that appellant testified in detail to all of his activities during the entire evening, yet we think this instruction was helpful, rather than harmful, to appellant, and he was in no way prejudiced by it. We find no error in refusing to give requested instruction No. 19 and in giving instructions Nos. 10 and $10\frac{1}{2}$.

It is also contended that the trial court erred in declaring that the testimony concerning the appellant's identity was sufficient to take the question to the jury. The complaining witness testified that she could see who the man was as he left the front porch, as it was "awfully light" that night; that she saw him as he left the house. It further appears that she positively identified appellant when he was brought to the police station, she being corroborated in this last identification by Sergeant White and Mrs. Bailey. On the other hand, there was testimony introduced on behalf of ap-

pellant, to the effect that the complaining witness stated she was not certain who it was; that before she went to the police station, she said it was "Ed" or "Eddie Smith." We think that, on this testimony, the question of identity became one for the jury. *State v. Seabrands*, 191 Wash. 472, 71 P. (2d) 393.

We have carefully examined this record, and believe the appellant, in all respects, had a fair trial, and that there was ample testimony to support the verdict.

The judgment is affirmed.

BLAKE, C. J., BEALS, STEINERT, and GERAGHTY, JJ., concur.

